**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**ANA MILENA SITU, et al.,**

**Plaintiffs**

**v.**

**JEROME O'NEILL, et al.,**

**Defendants.**

**CIVIL NO. 11-1225 (GAG)**

**OPINION AND ORDER**

In this case, Laura Rodríguez Situ (the "decedent") died as a result of injuries and second degree burns allegedly caused by an explosion at an apartment she rented. (Docket Nos. 2; 27; 126.) Plaintiffs, the decedent's heirs, filed suit on February 28, 2011, claiming that Jerome O'Neill ("O'Neill"), the administrator of the property, Elena Properties, Inc. ("Elena Properties"), the owner of the property, and MAPFRE PRAICO Insurance Company, as their insurer, (collectively "Defendants") are liable for the decedent's injuries and death pursuant to Article 1802 of the Civil Code of Puerto Rico, P.R. LAWS ANN. tit. 31, § 5141. (See Docket Nos. 2; 27; 126.)

Pending before the Court are two motions by Defendants to exclude expert testimony. First is Defendants' Motion to Exclude Expert Report and Testimony as to Plaintiffs' expert witness in economic damages, CPA Yanelly Pagán Isona ("CPA Pagán"), particularly, her testimony as to the alleged lost income calculated in relation to UNO Projects Consulting ("UNO Projects"). (Docket No. 442.) Plaintiffs opposed the motion. (Docket No. 470.) Next is Defendants' Motion to Exclude Expert Report and Testimony as to Plaintiffs' fire expert witness, Engineer Juan Charles ("Charles"). (Docket No. 439.) Plaintiffs opposed the motion. (Docket No. 467.) After analyzing

the briefs and the applicable law, the Court hereby **DENIES** both of Defendants' motions to exclude expert testimony at Docket No. 439 and 442.

## I. Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702. That rule provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The judge, as a gate-keeper, must ensure an expert's testimony is both relevant and is based on a reliable foundation.[1] See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 597 (1993); U.S. v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002). "Proponents . . . do not have to demonstrate that the assessments of their experts are correct, only that their opinions are reliable." Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreau, LLP, 2008 WL 2446331, at *2 (D.P.R. June 16, 2008) (citing Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)). While the general focus of this inquiry is the principles and methodology relied upon by the expert, the Court may consider the congruity of the data and the opinion proffered by the expert. See Gen. Elec. Co.

---

[1] The Daubert Court identified four factors that may assist the trial court in determining whether or not scientific expert testimony was reliable: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." Mooney, 315 F.3d at 62 (citing Daubert, 509 U.S. at 593-94). The factors are not a checklist for the trial judge to follow, but rather the inquiry is a flexible one, allowing the trial judge to determine and adapt these factors to fit the particular case at bar. See Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137, 150 (1999); Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15-16 (1st Cir. 2011).

v. Joiner, 522 U.S. 136, 146 (1997) (holding a court may conclude there is too great an analytical gap between data and the opinion proffered); Ruiz-Troche, 161 F.3d at 81.

Whether an expert meets these criteria is "a case-specific inquiry and . . . a question that the law grants the trial judge broad latitude to determine." Cummings v. Standard Register Co., 265 F.3d 56, 64 (1st Cir. 2001). The exclusion of expert testimony "is the exception rather than the rule," United States v. Martinez-Cintron, 136 F. Supp. 2d 17, 20 (D.P.R. 2001); and the calculation of damages is generally left to the jury. See, e.g., Benjamin v. Hillard, 64 U.S. 149, 167 (1860) ("all questions of damages are, strictly speaking, for the jury; and, however clear and plain may be the rule of law on which the damages are to be found, the act of finding them is for them."). The fact that an expert's opinion may be tentative or even speculative does not mean that the testimony must be excluded so long as opposing counsel has an opportunity to attack the expert's credibility. Payton v. Abbott Labs, 780 F.2d 147, 156 (1st Cir. 1985). When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury. Id.

## II. Motion to Exclude Plaintiffs' Economic Expert

Defendants move to preclude any testimony by CPA Pagán pertaining to the deceased's lost income in relation to the UNO Projects. (Docket No. 442.) Defendants object to the data used by CPA Pagán to finish her report, as this data is "unreliable, speculative, [and] unverified." Id.

CPA Pagán first submitted a calculation of lost income on March 13, 2012 ("March 2012 Report.").[2] (Docket No. 442-1.) On June 12, 2013, CPA Pagán submitted an amended report ("June 2013 Report") given that her previous report had erroneously calculated the decedent's

[2] This report included calculations of the decedent's lost earnings based on her earnings six years prior to passing away. Id. She based these calculations on income tax returns, earnings summaries, and check stubs from Open Systems, concluding the total lost income amounted to $1,787,635.00. Id.

monthly income in U.S. dollars instead of Colombian "pesos." (Docket No. 442-2.) The June 2013 Report presented two different scenarios. Id. First, it adjusted the lost earnings in employment with Open Systems to $709,688.00. Id. Second, it included a different picture of projected lost income related to UNO Projects. Id. The lost income from UNO Projects amounted to $2,061.948.00. Id. In reaching this conclusion, CPA Pagán analyzed UNO Project cost estimates and UNO Projects consulting services description. Id. Specifically, Exhibit IV of the June 2013 Report breaks down calculation of lost earnings according to various detailed projects from 2006-2009. Id. at 19. All information related to UNO Projects was provided by Attorney Luis Amadeo Hernández ("Hernández"), who was the decedent's business partner in this endeavour. Id.

After receiving yet more information from Plaintiffs, CPA Pagán amended her report a third time, on September 2, 2014 ("September 2014 Report"). (Docket No. 442-5.) The September 2014 Report incorporated newly found documents such as contracts, registration information, and several stop payments related to the UNO Projects that serve to corroborate the previous report and did not change the monetary figures. Id. CPA Pagán noted the newly-found documents were previously unavailable because the decedent's computer was also lost the day of the fire incident. Id. Eventually, third parties were able to obtain copies of these documents, which the report has now incorporated. Id. The September 2014 Report elaborates on the previous report as it pertains to UNO Projects, mainly, CPA Pagán received copies of a business registration by the decedent for AB Computer Consultants, and UNO Projects. Id. Among the new documents that CPA Pagán included in the September 2014 Report are contracts with OrthoCenter Dental Group, AB Computer Consultants payroll, a certification from the Colombian

Chamber of Commerce regarding UNO Projects, and evidence of registration for AB Computer Consultants. Id.

Defendants attack CPA Pagán's report in a number of ways. First, Defendants find untrustworthy that CPA Pagán relied on information provided by Hernández, including gross revenues and costs for the 14 entities identified as clients of UNO project. Defendants maintain that CPA Pagán failed to independently corroborate such evidence and failed to follow her own practice of verifying the data provided, including her previous calculations related to Open Systems. Additionally, Defendants believe Hernández information is shaky in itself, given that he did not provide any other information to corroborate the gross revenues, such as tax returns, bank accounts, receipts, or invoices.

The Court finds that CPA Pagán's last amended report, the September 2014 Report, is sufficiently supported and reliable to be presented to the jury. The jury will be able to assess all the data, documents, and information that Hernández provided so that CPA Pagán could reach her conclusions. The Court notes this is a peculiar case given that so much of the information usually relied upon by accountants was allegedly destroyed by the fire that eventually killed the victim. Because of this, Pagán testified that she had to rely on Hernández's detailed accounts of each project provided in a detailed excel spreadsheet, that she had no reason to believe he had created such document in preparation for litigation, and that she eventually received additional documentation that corroborated the information previously provided.

Given the peculiarity of this case, and that the evidence was allegedly lost in the fire, the Court finds it reasonable that CPA Pagán had to make certain assumptions. As CPA Pagán herself expressed, the process of creating a loss income report focuses on projections, and not on auditing.

However, the Court still finds that CPA Pagán obtained enough data as the methodology for accounting reports demands. Defendants are entitled to question CPA Pagán's judgment in failing to corroborate this data in the same way she had previously done with other reports, but the place to make those arguments is at trial. These alleged flaws go to the weight of the evidence rather than to admissibility, and challenges to the methodology used by an expert witness are usually adequately addressed by cross-examination. See Newell P.R., Ltd. v. Rubbermaid, Inc., 20 F.3d 15, 20 (1st Cir. 1994) ("[w]hen the factual underpinning of an expert opinion is weak, it is a matter affecting the weight and credibility of the testimony"); see also Daubert, 509 U.S. at 596 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

"[E]xpert opinions that are speculative do not need to be excluded as long as the opposing counsel has an opportunity for cross-examination in order to expose any weaknesses in the underpinnings of the expert testimony." Carrelo v. Advanced Neuromodulation Sys., Inc., 777 F. Supp. 2d 315, 319 (D.P.R. 2011) (citing United States v. Vargas, 471 F.3d 255, 264 (1st Cir. 2006)). Because the issues raised by Defendants go to the weight of the testimony and not to the admissibility requirement under Rule 702, the Court will not exclude CPA Pagán's expert testimony regarding UNO Projects and AB Consulting. Defendants' motion to exclude CPA Pagán's testimony is hereby **DENIED**.

**III. Motion to Exclude Plaintiffs' Fire Expert**

Defendants next move to preclude any testimony by Plaintiffs' fire expert witness, Engineer Juan Charles. (Docket No. 439.) Defendants argue that Charles failed to follow his

established practice in cases dealing with gas leaks when testing the gas pipe that he claims was the cause of the fire.[3] Id. at 4. As such, Defendants argue his report and testimony are unreliable and completely inadmissible. Id.

Charles maintains his report was done according to methodology and techniques established by the National Fire Protection Association's Guide for Fire and Explosion Investigations ("NFPA 921"). (Docket No. 439-5.) Charles states NFPA 921 is the guide that most fire and explosion investigators follow regarding standard procedures. Id.; see also Adams v. J. Meyers Builders, Inc., 671 F. Supp. 2d 262, 273 (D.N.H 2009) ("NFPA 921 represents a reliable methodology for investigating the cause of fires."). Based on this plan, in October, 2011, Charles conducted a visual inspection of the site of the events. (Docket No. 439-5 at 3-6.) Charles inspected for code compliance and structure. Id. Charles then issued a preliminary report, and recommended a new inspection of the stove and cylinders. Id. From this first site visit Charles maintains that the scene had been completely overhauled and the area of the fire explosion no longer existed. Id. Charles maintains the owner had removed the kitchen and gas piping line that supplied gas from the tank to the kitchen area. Id. He maintains he discovered the route of the piping line during his first inspection, and concluded that it had been removed and destroyed after the fire without having a pre-established chain of custody pursuant to the standard operating procedure. Id.

Next, Charles designed the testing system, selected the site for a testing process, and scheduled a date to test stove and cylinders. Id. He used a testing device specifically prepared for the test, a capacity scale, connectors, fillings, tools, and pressure measure and gas detector to test

---

[3] The fire that caused Laura Situ's death happened on March 10, 2010. (See Docket No. 439-1.)

the cylinders and stove. Id. Charles then took gas samples of both cylinders and sent them to Texas for analysis. Id.

Charles maintains that multiple factors limited the conditions and scope of his work up until this point: mainly that important debris was removed and disposed of after the explosion, that persons other than the pertinent authority had access to the scene, that cylinders were removed without the proper chain of custody, the room was remodeled, and the fire investigator failed to notify about a piping line under the bed. Id. At this point, Charles concluded that Defendants had violated relevant fire codes, the point of origin was not at the stove, the area of the fire was not in the kitchen, and that it was probable that the main gas leak came from under the bed, where most of the concentration from the fire came from. Id.

On August 25, 2014, Charles performed the last site inspection by doing two discrete excavations and visual inspection, and measuring and recording a gas pipe and electric line at the site. (Docket No. 439-11.) Charles submitted a supplemental report on August 30, 2014. Id. In it, Charles stands by his original opinion and conclusion, but included further information after the excavation. Id. The excavation revealed there was no gas line in the spot where Charles believed there would be, but a gas line was found on a second location. Id.

Defendants argue that Charles testimony should be excluded in its entirety because he failed to conduct appropriate testing on the gas pipe found after the excavation.[4] (Docket No.

[4] After the discovery deadline had elapsed, Plaintiffs sought twice an extension of the discovery deadline to test the gas pipe. (Docket Nos. 318; 372.) This Court referred both motions to Magistrate Judge Marcos López for disposition. (Docket Nos. 321; 374.) Magistrate Judge López denied both requests. (Docket Nos. 334; 383.) In analyzing the second motion for leave to re-open the discovery deadline, Magistrate Judge López held as uncontroverted that when Charles found the new gas pipe on the diagonal portion of the line, he tried to remove samples of the gas pipes for additional testing, but the defense did not allow it. (Docket No. 383 at 3.) Magistrate Judge López further held that counsel for defendants were not unreasonable in refusing to coordinate for the removal of the gas pipe a week prior to the discovery deadline, given that Plaintiffs had had ample opportunity to conduct their site tests. Id. at 8.

439.) Such failure does not render an expert's testimony wholly inadmissible. See, e.g., Adams, 671 F. Supp. 2d at 273. The Court finds that both Charles' expert report on fire causation and his supplemental report establish his theory of causation in a sufficiently reliable manner. Charles' conclusions could aid the jury in resolving the negligence issue.

Defendants have certainly exposed many weaknesses in Charles' reports, and a jury might find against Plaintiffs because of these weaknesses, however, Charles' reports are based on sound scientific methodology and are reliable enough to survive this Daubert challenge. Any lack of specific testing to this gas pipe goes to the weight and not to the admissibility of this testimony. See Payton, 780 F.2d at 156. Defendants' motion to exclude Charles's testimony is hereby **DENIED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 16th day of June, 2016.

*s/ Gustavo A. Gelpí*

GUSTAVO A. GELPI
United States District Judge